**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GEORGINA C. SANDOVAL, and TODD M. NORTH, *on behalf of themselves and those similarly situated*,<br><br>　　　　　　　　　Plaintiffs,<br><br>v.<br><br>MIDLAND FUNDING, LLC; MIDLAND CREDIT MANAGEMENT, INC., and JOHN DOES 1 to 10,<br><br>　　　　　　　　　Defendants. | Civil Action No: 18-09396 (SDW)(AME)<br><br>**OPINION**<br><br><br>July 7, 2021 |

**WIGENTON**, District Judge.

Before this Court is Plaintiffs Georgina C. Sandoval and Todd M. North's ("Sandoval," "North," or collectively "Plaintiffs") Motion for Class Certification (the "Motion") pursuant to Federal Rule of Civil Procedure ("Rule") 23. (D.E. 112.) Jurisdiction is proper pursuant to 28 U.S.C. § 1692(k)(d) and 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391(b). This opinion is issued without oral argument pursuant to Rule 78. For the reasons stated herein, the Motion for Class Certification is **DENIED**.

**I.　FACTS AND PROCEDURAL HISTORY**

Plaintiffs request certification of a putative class of individuals who were sent "M001 form letters" (the "Letter") by Midland Funding, LLC and Midland Credit Management, Inc. ("Midland" or "Defendants") between May 17, 2017 and January 7, 2019. (D.E. 112-1 ("Br.") at

1

1.) Plaintiffs allege that the following statement from the Letter was misleading: "You are hereby notified that a negative report on your credit record may be submitted to a credit reporting agency if you fail to meet the terms of your credit obligations." (*Id.*; D.E. 18 ("Compl.") ¶ 22.) Plaintiffs assert that the statement was false because, prior to sending the Letter, Defendants had "already reported Plaintiffs' accounts to one or more of the three major credit reporting agencies."[1] (Compl. ¶ 21.) Plaintiffs further allege that this putative class includes "approximately 11,212 accountholders in the state of New Jersey." (Br. 1.)

Plaintiffs filed their initial complaint in May 2018, (D.E. 1), followed by a First Amended Complaint in June 2018, (D.E. 4), and a Second Amended Complaint in January 2019, (Compl.). Plaintiffs raise claims pursuant to the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*. (*See generally* Compl.) On February 20, 2021, Plaintiffs filed their Motion requesting an Order certifying this case to proceed as a class action pursuant to Rule 23(b)(3). (Br. 11.) On April 19, 2021, Defendant opposed certification. (D.E. 120.) On April 26, 2021, Plaintiffs replied. (D.E. 127.)

## II. STANDARD OF REVIEW

A "party proposing class-action certification bears the burden of affirmatively demonstrating by a preponderance of the evidence [its] compliance with the requirements of Rule 23." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015), *as amended* (Apr. 28, 2015) (citing *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013)). Specifically, "every putative class

---

[1] Plaintiffs define the putative class as: "All natural persons with an address within the State of New Jersey, to whom, from May 17, 2017, through January 7, 2019, Defendants sent one or more 'M001' letters in an attempt to collect a consumer debt with an original creditor of Capital One Bank (USA), N.A., which contained the [allegedly misleading] statement," and "where Defendants had furnished the account to one or more consumer reporting agencies before the 'M001' letter was sent." (D.E. 112 at 4.)

2

action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012).

Under Rule 23(a), a class may be certified only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(1)-(4). These requirements are, respectively, referred to as the numerosity, commonality, typicality, and adequacy requirements. *See, e.g.*, *Marcus*, 687 F.3d at 590-91.

A party seeking class-certification under Rule 23(b)(3) must satisfy several additional requirements. First, "[a] plaintiff seeking certification of a Rule 23(b)(3) class must prove by a preponderance of the evidence that the class is ascertainable." *Byrd*, 784 F.3d at 163. To do so, the plaintiff must show that "(1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Id.* (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)). Second, Rule 23(b)(3) also requires the party seeking certification to show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23. These additional requirements are, respectively, referred to as the ascertainability, predominance, and superiority requirements. *See, e.g.*, *Byrd*, 784 F.3d at 161 n.4, 162, 164.

A. DISCUSSION

    a. **Numerosity**

A party seeking class certification must show that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23. Although, "[t]here is no minimum number of members needed," "generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.'" *Marcus*, 687 F.3d at 595 (quoting *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001)). Here, 11,212 people residing in New Jersey received the same Letter with the allegedly misleading credit reporting language. (Br. 1; D.E. 127 at 7.) Therefore, the proposed class meets the numerosity requirement.

### b. Commonality and Predominance

Rule 23(a) requires Plaintiffs to identify "questions of law or fact" that are "common to the class," and Rule 23(b)(3) requires "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23. "Because 23(b)(3)'s predominance requirement incorporates the commonality requirement, we will treat them together." *Georgine v. Amchem Prod., Inc.*, 83 F.3d 610, 626 (3d Cir. 1996), *aff'd sub nom. Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997). "The threshold for establishing commonality is straightforward: 'The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.'" *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 596–97 (3d Cir. 2009) (citing *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)). "The predominance inquiry 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation,'" *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011) (quoting *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 258 (3d Cir. 2009)), and "assesses whether a class action 'would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated,'" *id*. (citing Fed. R. Civ. P. 23(b)(3)).

4

The potential common questions of law and fact suggested by Plaintiffs reveal the absence of genuinely "class-wide" issues.[2] A case from this District, *Freid v. National Action Financial Services*, *Inc.*, is instructive. Civ. No. 10-2870, 2011 WL 1547257, at *4–5 (D.N.J. Apr. 20, 2011). In *Freid*, the plaintiffs attempted to certify a class based on allegations that a debt collector used up to six different call scripts to leave "ominous voicemails" that created a false sense of urgency regarding debt repayment. (*Compare id.* at *1, *4–5 *with* D.E. 127 at 2 (alleging that various letters were designed to "induce consumers" to call regarding debt repayment).) The *Freid* court denied certification, noting that the class was "problematic" because the ultimate finder of fact would "be tasked with deciding whether the actual communication received by the consumer was deceptive," and "[a]scertaining the characteristics of the actual communication would appear to be a very individualized inquiry." *See Freid*, 2011 WL 1547257 at *4–5.

Although Plaintiffs attempt to artificially narrow the class to the M001 Letter and present general questions related to the elements of an FDCPA claim as binding the putative class together, the Record demonstrates that Defendants sent many distinct "letter templates," (*see* D.E. 95-1 at 6 (discussing at least fourteen letter templates); D.E. 120, Newman Decl., Ex. A ("Canez Dep.") 163:9-15 ("There's a series of letters like this. And any one of those could by the next letter.")), in meaningfully different orders to the putative class members, (*see*, *e.g.*, D.E. 115, Keller Decl., Ex. 5 ("McClure Dep.") 59:15-19 (describing the "many instances where that [L]etter goes without credit reporting or before credit reporting started"); Canez Dep. 158:17-25 (Q: . . . [W]ere those accounts being reported to -- a credit reporting agency prior to the date of the letters in question? A: As I testified before, I don't know. That's not included in the class list that was generated.

---

[2] Plaintiffs present the following as potential common questions of law and fact: (1) Whether Defendants are debt collectors under the FDCPA; (2) Whether Defendants violated the FDCPA; (3) Whether Plaintiffs and the Class are entitled to statutory damages. (Compl. ¶ 30.)

Someone would have to manually go through and look at each individual account to determine credit reporting status at the time the letter was sent.)). The various letter templates result in a situation where, like *Freid*, "[l]iability … turn[s] on particularized issues as to the communication made by Defendant[s] to each class member." *Fried* 2011 WL 1547257 at *4–6 ("[T]here are six different scripts, and the differences among them precludes treating the group of them as a single, unitary practice."); Canez Dep. 161:15-163:8.

Further complicating any class-wide factual assessments, some of Defendants' correspondence was mailed to putative class members before credit reporting began, and some of these template letters contained the same allegedly problematic language as the M001 Letter. (*See, e.g.*, Canez Dep. 62:5-12; 66:10-18 (stating that the M001 [Letter] could be the "fourth, fifth, or sixth letter"); 177:24-180:14 (agreeing that there were "different versions" of the template); D.E. 120 at 16-17; D.E. 120, Newman Decl., Ex. H.) As a result, assessing class-wide liability requires considering the many types of correspondence that were mailed at intervals based on Defendants' complex mailing algorithm. (McClure Dep. 29:21-25 (discussing Defendants' reliance on a "combination of [] statistical models" and a "number of different factors," including the "time since the last letter was sent, the age of the debt, [and] the [account] work group," before making the decision to send specific letters to certain individuals).) Thus, the "broad issues" Plaintiffs suggest are red herrings, and, in truth, the putative class "claims vary widely in character" and

preclude straightforward assessment of class-wide proof.[3] *See Georgine*, 83 F.3d at 626. Even if some broad common questions exist, these shared issues do not predominate. *See Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 453 (D.N.J. 2009), *overruled on other grounds by Maniscalco v. Brother Intern. (USA) Corp.*, 709 F.3d 202, 207–08 (3d Cir. 2013).

Although this Court does not consider the merits of Plaintiffs' underlying claims at this stage, it will briefly respond to Plaintiffs' assertions that the FDCPA is a "strict liability" statute that does not require assessing any correspondence besides the M001 Letter.[4] (Br. 10.) Any trial that attempted to determine, for example, whether "Defendants . . . violated [Section 1692(e)(5)],"[5] (*see* Compl. ¶ 46), would require inquiring into whether the Letter's language amounted to a "threat to take any action that cannot legally be taken or that is not intended to be taken." (*See* 15 U.S.C. § 1692(e)(5).) In turn, this assessment would necessitate determining whether the allegedly problematic language is, in fact, threatening or misleading—a question that another district court

---

[3] In *Fried*, the language that was specifically relayed on certain in-person calls could not be fully reconstructed. Even though, in this case, Plaintiffs could theoretically reconstruct the order of template letters mailed to each putative class member, (*see* Canez Dep. 253:8-14 (stating that an accurate letter history would be available), this would require parsing many permutations of letter language, credit reporting date, and correspondence order. *See Reese v. Arrow Fin. Servs., LLC*, 202 F.R.D. 83, 93 (D. Conn. 2001) (noting that "the individualized assessment required to determine liability under the FDCPA" counseled "against certifying [the] class," because each member received a different set of "communications from defendant" rather than a single common communication); Canez Dep. 209:4-12 (discussing the "manual intervention" necessary to assess the letter and credit reporting histories).

[4] The FDCPA "imposes strict liability on debt collectors who 'use [a] false, deceptive, or misleading representation or means in connection with the collection of any debt.'" *Ramos v. LVNV Funding, LLC*, Civ. No. 18-5496, 2019 WL 1994463, at *3 (E.D. Pa. May 3, 2019). Thus, although the FDCPA does not require delving into a debt collector's subjective intent, the statute allows the ultimate factfinder to go beyond Plaintiffs' *ipse dixit* statement that the language in the Letter is "false, deceptive, or misleading." (*Compare id. with* Br. 10.)

[5] The operative complaint alleges violations of 15 U.S.C. §§ 1692(e)(2)(A), 1692(e)(5), 1692(e)(8), 1692(e)(1), and 1692(f). (Compl. ¶ 46.)

has answered in the negative.[6] (*Compare Dugan v. Midland Funding, LLC*, Civ. No. 17-4243, 2019 U.S. Dist. LEXIS 227118 at *1, *5 (N.D. Ill. Mar. 12, 2019) (concluding that the language "[y]ou are hereby notified that a negative report of your credit record may be submitted to a credit reporting agency if you fail to meet the terms of your credit obligations," "[wa]s not plainly or clearly misleading on its face") *with* Br. 3 (alleging that the same language is misleading).) Thus, without an individualized inquiry, "the words of the [letters] in and of themselves do not appear to be deceptive" and "alone do very little to prove" Plaintiffs' FDCPA claims. *Freid*, 2011 WL 1547257 at *4–5.

    **c. Typicality**

Under Rule 23(a)(3)'s typicality requirement, a party seeking class certification must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The purpose of this requirement is to "screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class." *Marcus*, 687 F.3d at 598 (citation omitted). Therefore, to determine whether a plaintiff has satisfied the typicality requirement this Court must "consider the attributes of the plaintiff, the class as a whole, and the similarity between the plaintiff and the class." *Id.* (citing *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d at 597). That said, "[i]f a plaintiff's claim arises from the

---

[6] Both named Plaintiffs acknowledge the same in their deposition testimony. (*See* Newman Decl., Ex. B ("Sandoval Dep.") 25:25-26:3; 53:25-56:3; 67:16-17 (Q: Were you confused by this language when you read it? A: No.); 162:22-163:3 (Q: So can you explain to me how is it that you could be confused as to whether or not your debt was being reported after this letter was sent to you . . .? A: I don't know.); *see also* Newman Decl., Ex. C ("North Dep.") 79:20-22 (acknowledging that the "least sophisticated consumer" standard does not apply to him); 84:24-85:2 (Q: Did you contact Midland Funding to express confusion about this letter? A: No.); 87:10-20 (Q:·Is there anything in the letter that stopped you from disputing the debt? A: No. Q: Is there anything in the letter that prevented you from making a payment? A: No. Q: Is there anything in that letter that forced you to make a payment? A: No.); 91:6-7 (Q: Were you confused by that language? A: No.); 142:3-6 (Q: [A]s of February of 2017, you knew that the account at issue was being reported? A: Yes.); 146:4-9.)

8

same event, practice or course of conduct" that gives rise to putative class members' claims, "factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class." *Id.* (citation omitted).

The Record fails to clearly demonstrate that Defendants acted with a "singular" course of conduct towards both North and Sandoval, let alone towards the class at large. Although the putative class includes individuals who had their delinquent accounts "furnished" by Defendants "to one or more [credit] agencies" before receiving the Letter, (Br. 4), when and why Defendants sent letters with the allegedly problematic language varied significantly, (*see* McClure Dep. 29:21-25; Canez Dep. 120:23-121:4 ("The direct mail team is responsible for everything from letter creation approvals and . . . . determine[ing] which consumer will receive which letter, as well as the template of the letter, and then the information that can vary based on consumer specific information.")). Thus, Defendant's "course of conduct" seems to have differed in meaningful ways for putative class members, calling into question whether the class claims "are based on the same legal theory,"[7] *Brosious v. Children's Place Retail Stores*, 189 F.R.D. 138, 146 (D.N.J.

---

[7] Plaintiffs' reliance on *Stair ex rel. Smith v. Thomas & Cook* is misplaced. 254 F.R.D. 191 (D.N.J. 2008); (Br. 17.) In *Stair*, "Plaintiff received a prior communication from a different debt collector about the debt in question . . . ." 254 F.R.D. at 199. Here, Defendants distributed the prior correspondence. For similar reasons, the logic that compelled a typicality finding in *Bordeaux* fails here. Although the putative class received "the same [M001] letter[s]," they may have also received the allegedly problematic M001 language in varied prior correspondence before credit reporting began. *Cf. Bordeaux v. LTD Fin. Servs., L.P.*, Civ. No. 21-60243, 2017 WL 6619226, at *4 (D.N.J. Dec. 28, 2017).

1999). As a result, Sandoval and North's claims and theories are not clearly "typical" of the putative class.[8]

Nor are Sandoval and North, who both received multiple letters from Defendant about the state of their debt before Defendant began reporting that debt to credit agencies, "typical" of the types of injuries alleged in the operative complaint.[9] (*See*, *e.g.*, Sandoval Dep. 74:5-7 (Q: Did you receive this letter in 2016? A: I will say yes.); 80:23-81:9 (noting that a 2016 letter that was mailed to her included the same credit reporting language as the 2017 M001 Letter); 82:21-24; D.E. 120 at 9-10 n.1.) Both named Plaintiffs received correspondence from Defendants before credit reporting began that "contain[ed] the same Credit Reporting Language" as the Letter. (D.E. 120 at 9; North Dep. 111:21-112:5 (Q: [Do you have any] reason to believe that you did not receive [this letter in May of 2015]? … A: No.); *see supra* 7 n.4.) Further, in certain combinations, Defendants' correspondence identified an available window in which Plaintiffs could pay their

---

[8] The class standing test overlaps with the adequacy of representation and the typicality inquiry because the "standard is satisfied" when the representative's "litigation incentives are sufficiently aligned with those of the absent class members." *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of N.Y. Mellon*, 775 F.3d 154, 161 (2d Cir. 2014). Although "[a]n FDCPA plaintiff 'need not prove that she was actually confused or misled," the plaintiff must prove that "the objective least sophisticated debtor would be." *Schultz v. Midland Credit Mgmt., Inc.*, Civ. No. 16-4415, 2020 WL 3026531, at *3 (D.N.J. June 5, 2020) (citing *Jensen v. Pressler & Pressler*, 791 F.3d 413, 419 (3d Cir. 2015)). It is far from clear that, when the merits of the Plaintiffs' claims are ultimately considered, the least sophisticated debtor standard will be met, and actual injury will be found. (*See* Sandoval Dep. 51:16-52:5; 29:10-16; McClure Dep. 54:10-22 (Q: So Midland knows that anything Midland is reporting on a person's credit can only hurt a person's credit, correct? … A: No. I disagree with that. Q: Why do you disagree? A: Because we also report payment … a delete … a paid in full … [and] [a]ll of those would be better than the previous reprieve status. Q. That's fair.); Canez Dep. 56:3-11 (Q: . . . [I]t's your testimony that the language is required? A: Yes, we are required to notify the consumer of their account status.).) Given the posture of this motion, however, this Court will accept that because Plaintiffs have asserted that they received "collection letters that were allegedly false, deceptive, or misleading in violation of Section 1692e," they still retain "Article III standing to sue." *Schultz*, 2020 WL 3026531 at *3.

[9] Sandoval's position as a regular (if not professional) plaintiff also raises typicality concerns. (*See* D.E. 120 at 5, 7, 29.) Though not explicitly stated, her testimony was highly suggestive that Mr. Kim's firm regularly reviewed her credit letters and developed case theories from them. (Sandoval Dep. 100:18-101:3 (acknowledging that it was Sandoval's "habit to send any collection letter [she] received to Mr. Kim," her attorney in this case); 47:22-48:4 ("Q: … So it is safe to say your decision to sue the defendants was prompted, again without divulging the substance of the conversation, [by] your meeting with your attorneys? A: Yes.); 163:22-164:11 (initially stating that she had never brought a lawsuit on behalf of a class before, retracting this statement, and acknowledging the existence of many such lawsuits).) North has also served as a class representative twice. (North Dep. 160:18-20; 77:17-78:6.)

debt. (*See* North Dep. 92:19-94:19 (noting that North "already knew Midland was reporting the … debt to the credit bureaus"); 92:9-94:7; 104:20-105:6; 108:9-109:24; 149:4-11; Sandoval Dep. 71:7-11 (acknowledging that "creditors typically report missed payments on a monthly basis"); 88:5-14 (acknowledging that Defendant would not report the debt if payment were made by April 6, 2016); 88:24-89:11 (Q: [Y]ou were warned if you did not make a payment or get on a payment plan, Midland would begin credit reporting? A: Yes.); *see also* Canez Dep. 141:20-22; 247:16-22.) Thus, although the fact that North and Sandoval received the M001 Letter may be typical of the class, "the question of what was actually communicated [by that Letter] appears to be a highly individualized matter." *Freid*, 2011 WL 1547257 at *5.

Finally, "a proposed class representative is not 'typical' under Rule 23(a)(3) if 'the representative is subject to a unique defense . . . .'" *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d at 598 (citation omitted). Although this Court will not pass on the merits of the underlying claims at this stage, *see Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 178 (1974), to the extent Plaintiffs argue that more-sophisticated parties may serve as "private attorney generals" for "least sophisticated" consumers, Sandoval and North's testimony remains notable for its potential to directly undermine the Complaint's proffered theory that the Letter's allegedly deceptive language influenced putative class members' decisions. (Compl.; D.E. 127 at 13); *Brown v. Card Serv. Ctr.*, 464 F.3d 450, 453 (3d Cir. 2006). In sum, it cannot be said that "the claims of the named plaintiffs and putative class members involve the same conduct," and typicality is not established. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 162 (3d Cir. 2001).

### d. Superiority

Under the superiority requirement, a party seeking class certification must show "that a class action is superior to other available methods for fairly and efficiently adjudicating the

controversy." Fed. R. Civ. P. 23. The Rule provides that "[t]he matters pertinent to these findings include": (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. *Id.* This requirement "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533-34 (3d Cir. 2004) (quotation omitted)).

Here, superiority has not been established. *See Newton*, 259 F.3d at 186. Although it is desirable to litigate related claims in a single action, as previously discussed, Plaintiffs' purported class would not function efficiently or properly protect class members' interests. *See*, *e.g.*, *supra* 8-10. Simply put, there are numerous factual issues that preclude efficient group adjudication *See* Fed. R. Civ. P. 23(b)(3) (in evaluating the superiority of the class action device, a court should consider the "difficulties" and "problems of management which are likely to arise in the conduct of a class action").

e. **Adequacy**

The adequacy requirement requires a showing that named plaintiffs will fairly and adequately protect the interests of the class, because they "have the ability and incentive to vigorously represent the claims of the class." *Rivet v. Off. Depot, Inc.*, 207 F. Supp. 3d 417, 430 (D.N.J. 2016) (citing *In re Cmty. Bank of N. Virginia Mortgage Lending Practices Litig.*, 795 F.3d 380, 393 (3d Cir. 2015)). "[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Id*. "Class representatives must be part of the class and possess the same interest and suffer the same injury

12

as the class members." *Beneli v. BCA Fin. Servs., Inc.*, 324 F.R.D. 89, 98 (D.N.J. 2018) (citation omitted). Determining adequacy involves a two-part inquiry: (1) "the named plaintiff's interests must be sufficiently aligned with the interests of the absentees;" and (2) "the plaintiff's counsel must be qualified to represent the class." *Id.* A named plaintiff is adequate if their interests do not conflict with those of the class members. *Id.*

Defendant identifies few specific red flags beyond the named Plaintiffs' prior litigation history. (D.E. 120 at 28-29.) Although having served as a class representative in "many prior class actions" will not "preclude [a party] filling that role in this case," *In re Vicuron Pharms., Inc. Sec. Litig.,* 233 F.R.D. 421, 427 (E.D. Pa. 2006), this Court shares Defendants' concerns regarding, in particular, Sandoval's "adequacy as a class representative [being] undermined by her credibility concerns," *Coyle v. Hornell Brewing Co.*, Civ. No. 08-2797, 2011 WL 3859731, at *2 (D.N.J. Aug. 30, 2011). Sandoval's testimony regarding her practice of sending all credit reporting letters to her counsel did raise potentially "antagonistic" conflicts between her and the class. (Sandoval Dep. 100:18-101:3; 47:22-48:4; 163:22-164:11.) Therefore, in conjunction with this Court's typicality concerns regarding both named Plaintiffs' claims, the adequacy requirement is not met.

### f. Ascertainability

Under the ascertainability requirement Plaintiff must demonstrate that (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition. *Hayes*, 725 F.3d at 355. With regard to the second prong of the ascertainability requirement, a plaintiff need only show that class members can be identified. *Carrera v. Bayer Corp.*, 727 F.3d 300, 308 n.2 (3d Cir. 2013). In this case, the class is "ascertainable" as long as Plaintiffs can identify each class member who received the M001 Letter. Although the defined putative class suffers from the

issues discussed previously as to commonality and predominance, superiority, typicality, and adequacy, this Court finds the "ascertainability" requirement met. *Id.* at 307.

In considering the requisite Rule 23 factors, this Court concludes that the putative class, as currently proposed, is not an appropriate vehicle for the adjudication of the alleged FDCPA violations. Here, common issues do not predominate, and the named Plaintiffs' claims are atypical of the wrongs alleged on behalf of the proposed class. As a result, the class action vehicle is not the superior format for this case, and the named Plaintiffs are inadequate representatives for its claims.

I. **CONCLUSION**

For the reasons set forth above, Plaintiffs' Motion for Class Certification is **DENIED**. An appropriate order follows.

/s/ Susan D. Wigenton<br>
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:     Clerk
cc:       Andre M. Espinosa, U.S.M.J.
           Parties