**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GEORGINA C. SANDOVAL and TODD M. NORTH, *on behalf of themselves and those similarly situated*,<br><br>  Plaintiffs,<br><br>v.<br><br>MIDLAND FUNDING, LLC, MIDLAND CREDIT MANAGEMENT, INC., and JOHN DOES 1 to 10,<br><br>  Defendants. | Civil Action No. 18-09396 (SDW) (AME)<br><br>**OPINION**<br><br>June 10, 2022 |

**WIGENTON**, District Judge.

Before this Court is Defendants Midland Funding, LLC ("MF") and Midland Credit Management, Inc.'s ("MCM") ("Defendants") Motion for Summary Judgment (D.E. 149) brought pursuant to Federal Rule of Civil Procedure ("Rule") 56, as well as Plaintiffs Georgina C. Sandoval ("Sandoval") and Todd M. North's ("North") ("Plaintiffs") Cross-Motion to Dismiss the Amended Complaint (D.E. 18) for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) and Defendants' Request for Sanctions pursuant to 28 U.S.C. § 1927 and 15 U.S.C. § 1692k(a)(3). Venue is proper pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a). This opinion is issued without oral argument pursuant to Rule 78. For the reasons stated herein, Defendants' Motion for Summary Judgement is **GRANTED**, Plaintiffs' Motion to Dismiss is **DENIED**, and Defendants' Request for Sanctions is **DENIED**.

1

I. **FACTUAL BACKGROUND**

Plaintiffs filed the instant lawsuit against Defendants MF, MCM, and John Does 1 to 10, alleging that Defendants violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, by sending "falsely threatening" collection letters to Plaintiffs in May and June of 2017 containing language stating that "[y]ou are hereby notified that a negative report on your credit record may be submitted to a credit reporting agency if you fail to meet the terms of your credit obligations" (the "Credit Reporting Language"). (*See generally* D.E. 18.) Plaintiffs claim that the letters were false and misleading because MCM had allegedly already begun reporting Plaintiffs' accounts to credit reporting agencies ("CRAs") before sending the collection letters. (*See generally* D.E. 18.)

i. **The Sandoval Account**

Sandoval opened a Capital One Bank (USA), N.A. credit card account (the "Sandoval Account"). (D.E. 149–12 ¶ 1.)[1] On or about December 17, 2015, the Sandoval Account was sold to MF and thereafter serviced by MCM. (*Id.* ¶¶ 3–4.) On January 6, 2016, MCM mailed to Sandoval a LT1Y letter (the "Welcome Letter") advising Sandoval that her account was sold to MF. (*Id.* ¶ 5.) The Welcome Letter also contained the Credit Reporting Language advising that "[y]ou are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit-reporting agency if you fail to fulfill the terms of your credit obligations." (*Id.* ¶ 6.)

Thereafter, Defendants mailed Sandoval a series of collection letters containing the Credit Reporting Language, which advised Sandoval of her obligations and Defendants' rights. (*Id.* ¶¶

---

[1] Record citations in this opinion are generally to Defendants' Local Rule 56.1 Statement of Material Facts Not in Dispute (D.E. 149–12), as well as the record citations contained therein. Plaintiffs did not file a Response to Defendants' Statement of Material Facts Not in Dispute or a Supplemental Statement of Material Facts Not in Dispute. Accordingly, the Court treats Plaintiffs' lack of submission as an admission of the facts therein.

7, 8, 10.) For example, on March 2, 2016, MCM mailed to Sandoval a DOE7 Letter containing, *inter alia*, the Credit Reporting Language. (*Id.* ¶ 7.) Then, on April 13, 2016, MCM mailed to Sandoval a M003 Letter containing, *inter alia*, the Credit Reporting Language. (*Id.* ¶ 8.) After failing to comply with the terms of her credit obligations, on May 6, 2016, MCM began reporting the Sandoval Account to the CRAs. (*Id.* ¶ 9.) Shortly thereafter, on May 17, 2017, MCM mailed to Sandoval an M001 letter (the "May 2017 Collection Letter") containing the Credit Reporting Language. (*Id.* ¶ 10.) However, despite Sandoval's receipt of the Welcome Letter, DOE7 Letter, M003 Letter, and May 2017 Collection Letter, Sandoval never made payment to MF or MCM on the Sandoval Account. (*Id.* ¶ 11.)

At a November 2019 deposition, Sandoval testified that she was not confused by the Credit Reporting Language and was aware that the Credit Reporting Language in the Welcome Letter and the May 2017 Collection Letter meant that the Sandoval Account may be reported to the credit reporting agencies if payments were not made. (*Id.* ¶¶ 35, 37, 43–45.) Sandoval further testified that she was aware that the Sandoval Account was reporting on her credit report prior to May 2017. (*Id.* ¶ 36.) Sandoval did not call, write, or make a payment to Defendants after receiving the May 2017 Collection Letter. (*Id.* ¶ 33.) Sandoval admitted that nothing in the Welcome Letter or May 2017 Collection Letter prevented her from making payment on the Sandoval Account or disputing the debt on the Sandoval Account. (*Id.* ¶¶ 31, 32, 46.) Instead, in December 2017, Sandoval sent a letter to MCM requesting a copy of the credit card agreement for the Sandoval Account. (*Id.* ¶ 48.) Thereafter, MCM opened an investigation regarding the letter and ultimately requested that the credit reporting agencies change the status of the Sandoval Account to "Disputed." (*Id.* ¶ 49.)

### ii.   The North Account

North opened a Capital One Bank (USA), N.A. credit card account (the "North Account"). (*Id.* ¶ 12.) On or about April 20, 2015, the North Account was sold to MF and thereafter serviced by MCM. (*Id.* ¶¶ 14–15.) On or about May 1, 2015, MCM mailed to Plaintiff a LT1U Letter containing the Credit Reporting Language stating that "[a]s required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations." (*Id.* ¶ 16–17.)

Thereafter, Defendants mailed to North multiple collection letters containing the Credit Reporting Language, which advised as to North's obligations and Defendants' rights. (*Id.* ¶¶ 18, 20.) On or about August 4, 2015, MCM mailed to North another letter, the DOE7 Letter, containing the Credit Reporting Language. (*Id.* ¶ 18.) After failing to comply with the terms of his credit obligations, on August 24, 2015, MCM began reporting the North Account to the CRAs. (*Id.* ¶ 19.) Shortly thereafter, on June 1, 2017, MCM mailed to North a M001 letter (the "June 2017 Collection Letter"), which contained the Credit Reporting Language advising that failure to make a payment on the North Account could result in negative reporting on his credit report. (*Id.* ¶ 20.) However, despite North's receipt of the LT1U Letter, DOE7 Letter, and June 2017 Collection Letter, no payment was ever made to Defendants on the North Account. (*Id.* ¶ 21.)

At a January 2022 deposition, North testified that he was not confused by the Credit Reporting Language and understood that the North Account would be reported to credit reporting agencies on a recurring basis as a result of failing to make payments. (*Id.* ¶¶ 53, 57, 59, 60.) North testified that he was aware that the North Account was reporting on his credit report prior to receiving the June 2017 Collection Letter. (*Id.* ¶ 61.) North did not contact Defendants, dispute the debt owed, or express confusion regarding the Credit Reporting Language. (*Id.* ¶¶ 53, 57.)

North admitted that nothing in the June 2017 Collection Letter prevented North from making payment on the North Account or forced North to make payment on the North Account. (*Id.* ¶ 54.)

### iii. Credit Reporting to the CRAs

Prior to reporting a consumer's account to the CRAs, MCM asserts that it sends multiple letters to the consumer containing the Credit Reporting Language advising that the consumer's account may be reported to the CRAs if payments are not made. (*Id.* ¶¶ 23–24.) MCM asserts that it does not report accounts to the CRAs that are paid in full. (*Id.* ¶¶ 26–27.) Thus, only after a consumer chooses not to pay his or her delinquent account will MCM begin reporting the account to the CRAs. (*Id.* ¶ 25.)

## II. PROCEDURAL HISTORY

On May 17, 2018, Plaintiffs filed their initial class action complaint (D.E. 1), followed by their First Amended Complaint on June 1, 2018 (D.E. 4), and Second Amended Complaint on January 15, 2019 (D.E. 18). Plaintiffs assert claims against Defendants alleging that Defendants violated the FDCPA, 15 U.S.C. § 1692 *et seq.* (*See generally* Compl.) Thereafter, on February 20, 2021, Plaintiffs filed a motion requesting an Order certifying this case to proceed as a class action pursuant to Rule 23(b)(3) to adjudicate their FDCPA claims against Defendants. (D.E. 112.) On April 19, 2021, Defendants opposed certification (D.E. 120) and Plaintiffs replied on April 26, 2021 (D.E. 127). On July 7, 2021, this Court denied Plaintiffs' Motion for Class Certification. (D.E. 130, 131.) Following discovery, Defendants filed the instant Motion for Summary Judgment on December 20, 2021. (D.E. 149.) Plaintiffs then cross-moved to dismiss their Amended Complaint for lack of subject matter jurisdiction. (D.E. 152.) All subsequent briefing was timely filed. (D.E. 153, 156.)

### III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations, unsupported assertions or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). Further, the nonmoving party is required to "point to concrete evidence in the record which supports each essential element of its case." *Black Car Assistance Corp. v. New Jersey*, 351 F. Supp. 2d 284, 286 (D.N.J. 2004). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof[,]" then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322-23. Furthermore, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The nonmoving party cannot defeat summary judgment simply by asserting that certain evidence submitted by the moving party is not credible. *S.E.C. v. Antar*, 44 F. App'x 548, 554 (3d Cir. 2002).

## IV. DISCUSSION[2]

### A.
### Plaintiffs Have Suffered No Concrete Harm Sufficient to Confer Article III Standing to Pursue Their FDCPA Claims Against Defendants

Standing to sue is a doctrine that ensures that federal courts do not exceed the constitutional limits on their jurisdiction, which extends only to "Cases" and "Controversies." *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (citing U.S. Const. Art. III § 2).

---

[2] Defendants' request for fees and costs associated with this action pursuant to 28 U.S.C. § 1927 and 15 U.S.C. § 1692k(a)(3) is denied. While Plaintiffs did not take action to apprise this Court of Plaintiffs' lack of Article III standing in the wake of the decision in *TransUnion LLC v. Ramirez,* 141 S. Ct. 2190, 2200 (2021) until after Defendants moved for summary judgment, this lawsuit was merit-based when Plaintiffs initially filed. (D.E. 152.) Since the filing of this lawsuit, Plaintiffs' motion for class certification was denied and the United States Supreme Court clarified the meaning of "concrete harm" required for Article III standing in *TransUnion LLC v. Ramirez*. Certainly, Plaintiffs could have moved to dismiss this matter several months ago after the decision in *TransUnion LLC v. Ramirez* underscored any harm that Plaintiffs alleged or could have alleged. Notwithstanding Plaintiffs' actions, this Court denies Defendants' request for fees and costs.

"Thus, federal courts can entertain actions only if they present live disputes, ones in which both sides have a personal stake." *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 305 (3d Cir. 2020). A plaintiff must demonstrate (1) "that he [or she] suffered an injury in fact that is concrete, particularized, and actual or imminent;" (2) "that the injury was likely caused by the defendant;" and (3) "that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)). "To allege injury in fact sufficiently, a plaintiff must claim 'that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical.'" *Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 162–63 (3d Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)). If the plaintiff "does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *TransUnion LLC v. Ramirez*, 141 S. Ct. at 2203. *Id.*

The United States Supreme Court "has rejected the proposition that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right" because "Article III standing requires a concrete injury in the context of a statutory violation." 141 S. Ct. at 2205 (citing *Spokeo, Inc. v. Robins*, 578 U.S. at 341). The United States Supreme Court recently held in *Ramirez* that:

> To have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, that they suffered a concrete harm. No concrete harm, no standing. Central to assessing concreteness is whether the asserted harm has a "close relationship" to harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms including [...] reputational harm.

8

*Id.* at 2200 (citing *Spokeo, Inc. v. Robins*, 578 U.S. at 340–341).

In *Ramirez*, a class of consumers brought a class action against a credit reporting agency under the Fair Credit Reporting Act alleging that the agency failed to use reasonable measures to ensure the accuracy of their credit files and instead maintained misleading alerts in those files incorrectly designating the consumers as "terrorists, drug traffickers, or serious criminals." *Id.* at 2209. The class included both members whose incorrectly flagged credit reports had been disclosed to third party creditors, and members whose misleading alerts in their credit files had not been disclosed to third party creditors. *Id.* at 2209–2210. After a jury returned a verdict for all class members, the Supreme Court reversed on standing grounds with respect to those plaintiffs whose reports had not been disclosed because, despite the statutory violation, these plaintiffs had not suffered a concrete injury. *Id.* at 2210. The Supreme Court explained that "[t]he mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm." *Id.*

The Supreme Court also rejected the plaintiffs' arguments that they suffered an "informational injury" when they received written disclosures from defendants that were formatted incorrectly. *Id.* at 2213-2214. The Supreme Court held that plaintiffs failed to demonstrate that they suffered any harm at all from the formatting violations because plaintiffs presented no evidence that they opened the mailings at issue or that they were confused by them. *Id.* at 2213. The Supreme Court explained that "[w]ithout any evidence of harm caused by the format of the mailings, these are bare procedural violations, divorced from any concrete harm." *Id.* Thus, the plaintiffs must establish some "downstream consequences" and "adverse effects" caused by a violation of the federal statute to "satisfy Article III." *Id.* at 2214 (quoting *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020) (dismissing FDCPA lawsuit for lack of

standing because "[t]he plaintiffs seek to recover for representations that they contend were misleading or unfair, but without proving even that they relied on the representations, much less that the reliance caused them any damages")); *see also Oh v. Collecto, Inc.*, No. 20-01937, 2021 WL 3732881, *1 (D.N.J. Aug. 23, 2021) (dismissing FDCPA lawsuit because plaintiff did not read, and thus could not have relied on the allegedly false letter).

Here, Defendants argue that Plaintiffs lack constitutional standing under Article III because Plaintiffs cannot prove a concrete harm and have put forward no evidence to show that they suffered any concrete harm. (D.E. 149-2 at 11-15.) Notably, in the wake of *Ramirez*, Plaintiffs have conceded that they have suffered no concrete harm. (*See generally* D.E. 152-1.) However, at the outset of this action and throughout the course of this action, Plaintiffs strenuously argued that they suffered harm arising from their receipt of collection letters from Defendants containing the Credit Reporting Language because Defendants had already begun credit reporting before sending the collection letters. (D.E. 18 ¶¶ 1, 17-23.) Plaintiffs alleged that they were misled to believe that meeting the terms of their credit obligations would prevent negative reporting on their credit record. (*Id.*) Significantly, the evidence at summary judgment does not support such claims. The record evidence clearly shows that Plaintiffs did not make any payments on their debts after receiving the May 2017 Collection Letter and June 2017 Collection Letter and failed to make payment because of their financial means to do so. (D.E. 149–12 ¶¶ 10, 21, 34, 40, 47, 55.) It is evident that Plaintiffs did not rely on the Credit Reporting Language and have suffered no harm from reading the Credit Reporting Language.

The record evidence further establishes that Plaintiffs received multiple letters containing, *inter alia*, the Credit Reporting Language before Defendants began reporting the Sandoval Account and North Account to the CRAs. (*Id.* ¶¶ 5, 7–8, 10, 17, 18, 20.) In fact, Plaintiffs were

aware that Defendants were reporting on their credit reports prior to Plaintiffs' receipt of the May 2017 Collection Letter and June 2017 Collection Letter due to their failure to make payment on their debts. (*Id.* ¶¶ 36, 61.) Plaintiffs admitted that the Credit Reporting Language was not confusing, and nothing in the collection letters stopped Plaintiffs from making payment or disputing their debts. (*Id.* ¶¶ 31–32, 35, 37, 43–46, 53–54, 57, 59, 60.)

Clearly, in light of *Ramierz*, Plaintiffs have suffered no concrete harm. Plaintiffs have conceded that their only alleged injury, "invasion of Plaintiffs' substantive rights protected by the FDCPA", is no longer sufficient to confer Article III standing because there is "no allegation or facts showing a physical, monetary, or intangible harm as expressed in *Ramirez*." (D.E. 152-1 at 4.) Thus, even assuming Plaintiffs could establish a violation of the law, the Plaintiffs in this case, like those in *Ramirez*, simply have suffered no concrete harm sufficient to confer standing—an alleged statutory violation alone does not cut it. *See TransUnion LLC v. Ramirez*, 141 S. Ct. at 2210, 2213-2214. Having asserted only an alleged statutory violation that resulted in no "downstream consequences" or "adverse effects" caused by said statutory violation, Plaintiffs fail to meet their burden of establishing the elements of standing and summary judgment is therefore warranted. *TransUnion LLC v. Ramirez*, 141 S. Ct. at, 2214 (holding "[n]o concrete harm, no standing").

Accordingly, Plaintiffs' Motion to dismiss the Second Amended Complaint for lack of subject matter jurisdiction is denied. (D.E. 152-1.) The decision in *Ramirez* underscores any harm that Plaintiffs previously alleged or could have alleged. *TransUnion LLC v. Ramirez*, 141 S. Ct. at 2200. Thus, this Court need not reach the issue of subject matter jurisdiction because the record evidence unequivocally establishes that Plaintiffs have suffered no concrete harm sufficient to confer Article III standing.

**B.**
**Applying the Least Sophisticated Debtor Standard to the Credit Reporting Language, the Credit Reporting Language Was Not Misleading or Threatening**

The FDCPA provides a private cause of action to consumers who have suffered "the use of abusive, deceptive, and unfair debt collection practices." 15 U.S.C. § 1692(a). Courts analyzing FDCPA claims apply an objective "least sophisticated debtor" standard, which is lower than "simply examining whether particular language would deceive or mislead a reasonable debtor." *Brown v. Card Serv. Ctr.*, 464 F.3d 450, 454 (3d Cir. 2006) (quoting *Wilson v. Quadramed Corp.*, 225 F.3d 350, 354 (3d Cir. 2000) (internal quotation marks omitted)). As the Third Circuit has articulated, "[t]his lower standard comports with a basic purpose of the FDCPA [...] to protect 'all consumers, the gullible as well as the shrewd,' 'the trusting as well as the suspicious,' from abusive debt collection practices." *Id.* However, a debtor cannot disregard responsibilities or adopt "bizarre or idiosyncratic interpretations of collection notices," as the standard "preserv[es] a quotient of reasonableness and presum[es] a basic level of understanding and willingness to read with care." *Wilson*, 225 F.3d at 354–55 (internal quotations and citations omitted).

Section 1692e of the FDCPA generally prohibits the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt" and includes a non-exhaustive list of prohibited conduct including, but not limited to, using "any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. § 1692e(10). A communication is false, deceptive or misleading "when it can reasonably be read to have two or more meanings, one of which is inaccurate or contradictory to another requirement." *Devito v. Zucker, Goldberg & Ackerman*,

12

LLC, 908 F. Supp. 2d at 571 (citing *Wilson*, 225 F.3d at 354); *see also Campuzano–Burgos v. Midland Credit Mgmt., Inc.*, 550 F.3d 294, 298 (3d Cir. 2008)).

Here, applying the least sophisticated debtor standard, the Credit Reporting Language stating—"you are hereby notified that a negative report on your credit record may be submitted to a credit reporting agency if you fail to meet the terms of your credit obligations"— was not "false, deceptive, or misleading." 15 U.S.C. § 1692e(10). The least sophisticated debtor would not be misled by such simple, non-threatening language because the Credit Reporting Language in the various collection letters only provided notice that the delinquent accounts were subject to credit reporting and advised Plaintiffs that negative credit reports *may* be submitted for continuing to fail to pay their debts. (D.E. 149–12 ¶¶ 5, 7–8, 10, 17–18, 20.) The Credit Reporting Language, as Plaintiffs admitted, merely reflected that Defendants had the right to submit credit reports indicating that the accounts remained unpaid, which is synonymous with a widely known fact that failure to pay debts that are owed might adversely affect one's credit record. (*Id.* ¶¶ 37, 44–45, 59–60, 62.) Importantly, the record evidence has demonstrated that Plaintiffs received multiple letters from MCM containing the Credit Reporting Language before any credit reporting was ever submitted on their accounts due to Plaintiffs' unpaid accounts. (D.E. 149–12 ¶¶ 5, 7–8, 17–18.) Therefore, summary judgment is also warranted because the Credit Reporting Language in the collection letters was not "false, deceptive, or misleading" in violation of the FDCPA. (D.E. 149– 12 ¶¶ 5, 7–8, 10, 17–18, 20); *see also* 15 U.S.C. § 1692e(10).

Moreover, Plaintiffs do not address or dispute Defendants' argument that the language at issue plainly does not violate the FDCPA. (*See generally* D.E. 152–1.) Instead, Plaintiffs argue that this Court is not permitted to issue a substantive ruling on Defendants' Motion for Summary Judgment because this Court lacks subject matter jurisdiction. (*Id.* at 4-5.) Plaintiffs' argument is

13

unavailing. This Court is well within its parameters to issue a substantive ruling on Defendants' Motion for Summary Judgment. Plaintiffs have maintained throughout the course of this action up until Defendants moved for summary judgment that Plaintiffs have suffered an injury. It is only now, in what could be considered "gamesmanship" that Plaintiffs admit that they have suffered no injury and this matter should be dismissed for lack of subject matter jurisdiction. For the reasons stated herein, Defendants' motion for summary judgment is granted.

## V. CONCLUSION

Defendant's Motion for Summary Judgment is **GRANTED** with prejudice, Plaintiffs' Motion to Dismiss is **DENIED**, and Defendants' Request for Sanctions is **DENIED**. An appropriate order follows.

                                                                                                                                 /s/ Susan D. Wigenton  
                                                                                                                                **SUSAN D. WIGENTON, U.S.D.J.**

Orig:   Clerk  
cc:     Parties  
        Andre M. Espinosa, U.S.M.J.